**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CRIMINAL NO. 13-247-1 (ESH)** |
| | : | |
| **JOHN C. BEALE,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, hereby submits this memorandum in aid of sentencing concerning the Defendant, John C. Beale ("Beale" or "the Defendant"). The Pre-Sentence Report ("PSR") correctly calculated the Defendant's total offense level under the Guidelines at a 19 (30-37 months). *See* PSR at p. 10, ¶ 46. The government and the Defendant stipulated in the plea agreement to the same total offense level.

## SUMMARY OF THE GOVERNMENT'S SENTENCING RECOMMENDATION

The government submits that a sentence at the mid-range of the Guidelines for offense level 19 is reasonable in light of, among other things, the seriousness of the offense and the need to afford adequate deterrence. The Defendant, for more than a decade, went to great lengths to lie to his supervisors and managers at the U.S. Environmental Protection Agency ("EPA"). In his role as a high-ranking EPA official, the Defendant had the responsibility to perform his duties at a level commensurate with the trust that the Defendant's managers and supervisors afforded him. However, the Defendant instead violated that trust and stole nearly one million dollars from the EPA in the form of unearned salary and benefits.

## FACTUAL BACKGROUND

On September 27, 2013, the Defendant pleaded guilty to one count of theft of government property, in violation of 18 U.S.C. § 641.   In the Statement of Offense, which Beale signed as part of his plea agreement, the parties agreed that from in or around 1989 until in or around April 2013, Beale was employed by the EPA in the office of Air and Radiation.   For much of his time at the EPA, Beale was a Senior Policy Advisor.   Beale's specific duties within the EPA included assisting the Assistant Administrator of the EPA in planning, policy implementation, direction, and control of EPA programs.

On or about August 23, 2000, Beale received a promotion to Senior Level ("SL") employee, making Beale among the highest paid, non-elected federal government employees. In or around June 2000, Beale received authorization and was awarded a 25% Retention Incentive Bonus for three years.   The purpose of the Retention Incentive Bonus was to ensure Beale continued to work at the EPA, rather than leave the federal government and seek employment elsewhere.   The Retention Incentive Bonus was supposed to expire after 2003, but Beale nevertheless continued to receive the Retention Incentive Bonus through 2013.

### Fraudulently Obtained Parking Benefits

In or around January 2002 Beale claimed that because he had contracted malaria while serving in the U.S. Army in Viet Nam, he needed a parking spot within EPA's Ronald Reagan building.   Beale was awarded a parking spot due to his claimed medical condition, and the EPA subsidized the payment for the parking spot at a rate of approximately $200 per month.

Beale never served in Viet Nam and never contracted malaria.   Beale maintained and used the parking spot at the Ronald Reagan building until on or about June 1, 2005, at a cost of approximately $8,000 to the EPA.

2

**<u>Unauthorized Absences</u>**

Beginning in early 2000, Beale began to take approximately one day per week off of work.   Beale did not submit requests for annual leave for this time, and did not inform his supervisors as to the reason for his absences.    Rather, Beale included weekly entries on his EPA electronic calendar that Beale titled "DO oversight."    This entry intended to identify those days that Beale was purportedly working at the Central Intelligence Agency ("CIA"), Directorate of Operations.   In or around 2001, Beale told his EPA manger that he was assigned to an inter-agency, special advisory group working on a project with the Directorate of Operations at the CIA. Thereafter, Beale continued to include weekly entries on his EPA calendar that Beale titled "DO oversight."    Between approximately 2000 until in or around June 2008, Beale took approximately 102 days off under the auspices of his work for the CIA, without ever submitting requests for leave.   Beale simply did not show up to work at the EPA on days he claimed he was working at the CIA, yet still received his EPA salary as if he had performed his EPA assigned duties for that day.

Between 2005 and 2007, Beale took approximately five trips to Los Angeles, California, purportedly for work on a research project that had no internal controls or oversight.   While in California, Beale stayed in Bakersfield and visited family members who lived nearby.   For the five trips, Beale was reimbursed by the EPA in the amount of $57,235.   Beale did not need to travel to California to work on the research project, which could have been done at his home or at his office at the EPA.   Beale used the research project as the means to have the EPA pay for his personal travel.   Beale never produced any written work product regarding the research project and the research project was never completed.

3

In June 2008, Beale failed to report to the EPA offices for approximately six months. Beale told EPA managers and employees that he was either working on the research project or spending time working for "Langley."   Using these excuses, Beale was absent from the EPA from in or around June 2008 through in or around December 2008 and never submitted a leave request for this time.   During this lengthy unexcused absence, Beale continued to receive his EPA salary.   From in or around January 2010 until in or around May 2011, Beale failed to report to work at the EPA on approximately 9 days, claiming that he was working with the CIA for those days.   Beale never submitted a leave request for these days, but was paid his salary as if he had performed his EPA-assigned duties.

In or around May 2011, Beale announced that he was retiring from the EPA.   In and around June 2011, Beale informed EPA MANAGER # 2 that his work at the CIA would require him to be out of the EPA office for extended periods of time.   Without ever receiving approval or submitting a request for leave, from in or around June 2011 until in or around December 2012, Beale did not come to work at the EPA.   During that time, Beale sent several emails to EPA MANAGER # 2 and others at the EPA claiming that he could not come to work because of his CIA matters.   In several of these emails, Beale stated that he was away on international travel, but was in fact in the Washington, D.C. metropolitan area or at his vacation home in Truro, Massachusetts.


**"The Retirement Cruise"**

On or about September 22, 2011, Beale and two other long-term EPA employees celebrated a retirement party on a dinner cruise on the Potomac River.   Several high ranking EPA managers attended the party, including EPA MANAGER # 2.   Following the party, EPA

MANAGER # 2 believed that Beale had retired, and EPA MANAGER # 2 did not see Beale at the EPA offices after the party.

On or about November 11, 2011, Beale told EPA MANAGER # 2 that he would be using the remainder of his annual leave for approximately two months and would be officially retired from the government sometime in January or February, 2012.

In or around April 2012, EPA MANAGER # 2 inquired about Beale's retirement status with EPA human resources managers.   In or around November 2012, EPA MANAGER # 2 learned that Beale's time and attendance records were still being approved and Beale was still receiving a paycheck from the EPA.   As a result, EPA MANAGER # 2 learned that despite his announcement and participation at the retirement party, Beale was still an EPA employee.

On or about November 6, 2012, after EPA MANAGER # 2 asked Beale about his employment status, Beale responded in an email stating "I just got back into the country from a too long trip yesterday and tonight's outcome will have a significant impact on those 'Plans' of mine."   Contrary to Beale's claim that he was out of the country, Beale never left the United States in or around November 2012.

On or about November 30, 2012, Beale informed EPA MANAGER # 2 that "[t]oday is my last day of what I consider substantive work in the government.   I still have to spend some time . . . out processing and being debriefed . . . I will have a much better idea of how long this will take after I . . . get briefed on the debriefing process."

Contrary to his statements to EPA managers and supervisors, Beale never worked with any element or department of the Central Intelligence Agency.   Beale was never assigned to an inter-agency advisory group working with the Directorate of Operations.   Beale was never extended a top secret clearance by any agency of the United States government.

I.     **Based on the sentencing factors in 18 U.S.C. § 3553(a), the government recommends a sentence at the mid-range of the advisory Guidelines range.**

      A.     **The parties' stipulated Guidelines range.**

Here, the parties stipulated in the plea agreement to a Total Adjusted Offense Level of 19, with a criminal history category of I, the attendant range is 30-37 months' imprisonment, based on the following:

| | | |
|---|---|---:|
| (a) | Base Offense Level<br>2B1.1(a)(1) – Statutory maximum less than 10 years | 6 |
| (b) | Specific Offense Characteristics<br>2B1.1(b)(H) – Loss of more than $400,000 | 14 |
| (c) | 3B1.3   Abuse of a position of Trust | 2 |
| **TOTAL** | | **22** |

The parties agreed that a 3-level reduction was appropriate, pursuant to U.S.S.G. § 3E1.1(a) and (b), based on the Defendant's acceptance of responsibility.   Based on a 3-level reduction for acceptance of responsibility, the Defendant's stipulated offense level was 19 (30-37 months) with a criminal history category of I.   The Probation Department agreed that this was the appropriate offense level.   *See* PSR p. 10, ¶ 46.

      B.     **The nature and circumstances of the offense support a within-Guidelines sentence.**

The nature and circumstances of the offense demonstrate that a Guidelines sentence at an offense level 19 is reasonable in light of the extraordinary circumstances of this offense.   The Defendant, early in the case, accepted responsibility and assisted the government with its investigation, including voluntarily meeting with prosecutors and investigators without protections afforded by the government's standard proffer letter.   In addition, the Defendant paid

his restitution requirement in full before he entered into his plea of guilty.   The Court should credit the Defendant for these efforts.

However, it cannot be lost that the Defendant defrauded the EPA for more than ten years. During the course of the Defendant's conduct, he lied about the reasons for his repeated and lengthy absences from work.   He lied about the nature of military service, claiming that he served in Viet Nam, merely to obtain a parking spot.   The Defendant participated in a retirement cruise celebrating his service to the EPA, and following this party, continued to receive a paycheck from the EPA.   When challenged as to why he continued to receive pay following his "retirement," the Defendant continued to lie to his supervisors that he continued his non-existent work with the Central Intelligence Agency, up and until the Defendant was called back into the EPA's offices. This conduct falls squarely within the heartland of the Guidelines concerning theft of government property.

**C.      The history and characteristics of the Defendant.**

Pursuant to 18 U.S.C. § 3553(a)(1), the Court should consider the Defendant's history and characteristics.   The history and characteristics of the Defendant demonstrate that a Guidelines sentence at an offense level 19 is reasonable in light of the need to protect society from the Defendant for a significant period of time.   The Defendant has no one to blame for his criminal conduct but himself.   There is nothing in the Defendant's background as a son, husband, or surrogate father that appears to have triggered his criminal conduct.   He appears to have led a normal childhood, obtained undergraduate, graduate, and law degrees, and worked in a variety of positions, including practicing law, and worked his way into a senior position of respect and trust at the EPA.   There apparently was also nothing in the Defendant's background that could have led one to predict that he would engage in such criminal conduct.   The Defendant has no prior

criminal history.   It appears the Defendant's only other contact with the judicial system was a 1996 traffic citation for expired tags.

But make no mistake: This Defendant has engaged in crime of massive proportions.   The Defendant's conduct goes far beyond simple time and attendance fraud.   The Defendant achieved a senior position at the EPA from which he worked closely with the top levels of EPA management.   The Defendant, as described in his Sentencing Memorandum, engaged in high-level policy discussions regarding amendments to the Clean Air Act.   Indeed, the Defendant served as the chairman of the Clean Air Work Group, a position that saw him work with the White House and coordinate the EPA's activities before Congress as both branches of the government considered amendments to that legislation.

Having earned the trust and respect of his superiors for this work, the Defendant violated that trust in a historic fashion.   Rather than continue to perform his work at the level that had resulted in awards, the Defendant chose to lie to his friends, family, and employer for more than ten years to avoid his duties at the EPA.   The Defendant also lied to his supervisors and managers to obtain benefits and perks, including travel and parking subsidies, which he was simply not entitled to receive.   Moreover, once confronted by investigators about his continued deception, the Defendant initially chose to continue to cover his tracks and, in or around April 2013, met with a few close EPA colleagues to tell them that he was under investigation.   The Defendant, however, rather than admit his wrongdoing, continued his pattern of deceit by telling these colleagues that the Defendant was "going to take one for the team" by accepting responsibility for a criminal charge, likely go to jail, and pay massive amounts in restitution, all in an effort to protect those people that the Defendant claimed he worked with in the clandestine services.

Greed, coupled with a sense of entitlement, drove the Defendant's conduct.   In addition to the more than $57,000 the Defendant charged to the government for his unnecessary travel to California, the Defendant frequently submitted, and received approval, for outrageous expenses on other government travel.   This included approval of first-class airline travel due to a claimed medical condition.   Moreover, in one instance, in 2008, the Defendant submitted an expense report, which was approved, for a trip that totaled more than $23,000.   This astronomical sum was generated during a week-long trip to attend meetings in London, England.   During this trip, which included more than $14,000 in first-class air travel, the Defendant stayed at a hotel that was offsite from the meetings, despite the fact that the organization with whom the Defendant was meeting recommended a hotel that was both closer to the meeting site and far less expensive.   This, however, was not good enough for John Beale, and he chose to stay at a hotel that cost the government more than $6,000.   Simply put, the Defendant failed to act as a conscientious steward of taxpayer dollars.   This conduct merits a term of imprisonment consistent with a total offense level 19.

**D.      The need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence; and (C) to protect the public from further crimes of the Defendant.**

Here, a Guidelines sentence at an offense level 19 is also reasonable in light of the need for the sentence imposed to reflect the seriousness of the offense, provide just punishment for the offense, and to afford adequate specific and general deterrence.   For more than ten years, the Defendant engaged in his pattern of deception.   The nature of this deception was outrageous and notorious.   The Defendant's lies about injuries incurred while serving in Viet Nam are an insult to those who actually served in that conflict and suffered as a result.   The Defendant's lies about

working with the CIA are offensive to those individuals that actually perform this serious, and sometime dangerous, work on behalf our nation.   The Defendant's pattern of deception to avoid work as a high-ranking government official stained the efforts performed by the entire federal work force.   Ultimately, the Defendant's pattern of lies deprived the EPA of nearly one million dollars – money that could have been allocated to further the EPA's mission.   Taken together, the Guidelines range of 30-37 months reflects the seriousness of the Defendant's conduct.

The need to specifically deter the Defendant from engaging in future criminal offenses also supports the reasonableness of a Guidelines range of 30-37 months.   Although the Defendant has no prior criminal history, his first criminal conviction was a blockbuster.   Throughout his pattern of deceit, the Defendant showed no real regard for the rules that applied to him as a public official.

For similar reasons, the need to deter others from engaging in similar criminal conduct supports the reasonableness of a Guidelines range of 30-37 months.   Such a prison term would send a strong message to other public officials that the criminal law will deal harshly with those who choose to lie on such a massive scale.

**E.     The kinds of sentences available**.

The maximum statutory term of imprisonment here is ten years and the Court may also impose a term of supervised release of not more than three years.

The Court may impose a fine pursuant to 18 U.S.C. § 3571(b) of the greater of:   (1) $250,000 pursuant to 18 U.S.C. § 3571(b)(3); or (2) twice the pecuniary gain or loss pursuant to 18 U.S.C. § 3571(d).

According to the PSR, the Defendant has sufficient net worth such that he has the ability to pay an immediate fine.   *See* PSR pp. 17-18.   However, the PSR does not recommend a fine.   *See id.* p. 22, ¶ 94.   Even though the Defendant paid the full restitution amount of $886,186 and has

10

further agreed to pay $507,207 in forfeiture, the government believes a fine at the mid to high range of the Guidelines would be appropriate in this case.   As the Defendant said in his own sentencing memorandum, greed was a force that drove the Defendant's conduct.   Given this admission, the government disagrees with the PSR recommends that the Court impose a fine.

**F.      The sentencing range established by the Guidelines.**

The government and the Defendant stipulated in the plea agreement to an adjusted offense level of 19.   With a Criminal History category I, which the PSR has recommended, the resulting advisory sentencing range under the Guidelines is 30-37 months.

In the plea agreement, the parties stipulated that the applicable fine range under the Sentencing Guidelines applicable to an offense level 19 is from $6,000-$60,000, to which the Probation Office concurred.   Since the offense is a Class C Felony, the guideline range for a term of supervised release is one to three years.

**CONCLUSION**

For the foregoing reasons, the government recommends a sentence at the mid-range end of the Guidelines, three years of supervised release, restitution in the amount of $886,186, payable to the EPA, forfeiture in the amount of $507,207, and a fine at the mid to high range of the Guidelines.

Respectfully submitted,

RONALD C. MACHEN JR.
United States Attorney
For the District of Columbia

By:    _____/s/_____
JAMES E. SMITH
D.C. Bar No. 482-985
United States Attorney
Fraud and Public Corruption Section
555 4th Street, N.W.
Washington, D.C.   20530
(202) 252-6976
James.smith9@usdoj.gov